Okay. May it please the court, my name is William Kopany. I represent Mr. Harley, who is the attorney who is appealing his contempt sentence in this matter. Yeah. And I also represent Marcelle Charles. Is he here today? I'm sorry, Mr. Harley? Yeah. No, he's not, Your Honor. Making an appearance in the Superior Court, is he? Your Honor, he's a fairly active trial lawyer who appears in both state and federal courts, but I don't know if he's making an appearance at this moment in the Superior Court. If it pleases the court— That was a bad joke. Well, it was a worse answer. I apologize. We've been allotted 20 minutes, and I have two clients here who have really completely different appeals, and Mr. Hansen, who is now standing, who represents Mr. Ramirez, we've agreed to try to divide our 20 minutes—10 minutes each. With the Court's permission, I'm going to address the contempt appeal first briefly— Yeah, go ahead. —and then reserve time for questions, and then turn to the criminal appeal. All right. Your Honors, we've raised three issues on this contempt appeal. The one that I hope the Court will address and decide in the public's favor on is the sufficiency of the evidence of wilfulness. This Court rarely publishes opinions on what constitutes wilfulness. There's no question here of the act, that is, that the lawyer wasn't where he was ordered to be on time. The trial court was obviously angry with Mr. Harley, said things that indicated that anger sort of throughout the treatment of this discussion. Trial court said things like, it's almost as fundamental as the supremacy clause. You had appearances in state court and federal court at the same time, and you just made the wrong choice, counsel. You drove your car to the wrong court because— We read up. Yeah. And the question is, does the fact that the alleged contempt or sort of did a volitional thing, you know, which is the general intent to rule in criminal cases, that is, of going to state court, does that really meet the requirement of willfulness? Or, in fact, when a lawyer is being whipsawed between a state judge who finds out that the lawyer who's in a trial that's going over time has been ordered to federal court at Well, it's a little different than that. It's a little different than absolutely, you know, intentionally saying, I'm going to go to state court instead of federal court and so forth. You have here a lawyer who had to know he was in a bind. As a matter of fact, he knew he was in a bind when he put trials back-to-back two weeks   No, I don't want to interrupt your question. As soon as he knew that he was really in a bind, he made written applications to both the trial court in the superior court and to the federal court well in advance, three days before the appearance in federal court, and said, I need a one- or two-day continuance in one of these cases because the prosecutor in my state attempted murder case has had witness problems. And although this trial was supposed to be done on the 28th of September, and I would have plenty of time to be here to start the federal trial on October 1st, it's gone over. And the trial judge in the superior court has ordered me back on October 1st to argue my case to the jury. And so I'm asking for one day. Let me ask you this on the timing. Was the commencement of the evidentiary hearing in the superior court delayed? Or was it merely a delay in a particular witness? Your Honor, what was delayed was some of the prosecutor witnesses didn't arrive in time. And the witnesses, as I understand the record here, the witnesses in the superior court didn't start testifying until after the start date, the correct start date. And how long after the scheduled start date do we have an interval before the actual start date of testimony? I don't know. I don't think the record shows how long. What Mr. Harley's declaration said was, as I understand it, is that as soon as he realized that they weren't going to be able to finish the case in time for him to be in federal court on October 1st, he applied to the superior court to either just recess the trial for one day so he could go to the federal court. Because, ironically, there was going to be a dark day in the federal case right at the beginning. So if the judges could have simply accommodated the need to be in both places for a day or two, both of these cases could have been resolved, the lawyer could have been in both places. Why doesn't he, as soon as the delay shows up, not the absolutely inevitable consequences of the delay, but he knows that there's a delay at the front end, which is then what Why doesn't he, as soon as the delay problem shows up, alert the district court? I mean, to ask the district court on Friday for a continuation of a multiple defendant case that's scheduled to go the following Tuesday, that's dangerous. Well, Your Honor, we supplemented the excerpt of record with a September 10th transcript where Mr. Harley was present when another lawyer, the lawyer, Mr. McDonald, for my client on the criminal part of this case, made a motion to continue supported by, well, what we will argue in that case was substantial evidence that he needed the additional time, and the trial judge made it absolutely clear to Mr. McDonald and Mr. Harley's presence that the court was not going to change its schedule and that there were witnesses that would be inconvenienced and that the case was set for a long time and this case was going to go on the date set. All the more reason that if he has a problem, he better alert that district judge pretty early because the district judge has made it very clear that she's bound to determine that this is going to go forward. So that when she denies the motion that he might make, you know, 10 days in advance because he knows there may be a problem in Superior Court, he knows the motion's been denied and he can go back to Superior Court and say, Judge, I'm between a rock and a hard spot. Your Honor, with all respect, I would ask you if you were sitting as a trial judge in Federal District Court and a state, and a lawyer who was due to appear on October 1st before you said, Your Honor, I have a case set in Superior Court on September 14th. It's a two-week trial estimate and some problems are developing and I'm not sure this case is going to be over on time. I don't know yet because I can't tell how it's going to go. But I want to ask you now to continue your October 1st date with all these 27 witnesses that you've already denied a continuance for the co-defendant on. I want you to continue that in case I'm going to run into an actual conflict between now and the end of September. I submit that most district judges would say, Well, counsel, we'll wait until you really have a problem. I understand that, but then at that point, maybe eventually the district judge calls the Superior Court judge. Yes, Your Honor, but not on the day that the written motion was made. It was only on the day of the hearing that the federal judge called the state judge. And, Your Honor, the question really implies that it would be contempt or willful contempt to not sort of predict enough in advance what the problem is going to be. And I read the case law saying the decision has to be willful and it has to be a decision to disobey a court order. What Your Honor seems to be saying is it wasn't the best practice. That counsel could have done some things earlier on to sort of try to be in a better position. But I submit on this record there is no chance. I thought you said a motion was made. It was, but not 10 days or 15 days as Judge Fletcher's question seems to be implying should have been done when we had back-to-back trials. My question wasn't quite so back up as that. It was not that we got back-to-back trials. He knew that a long time ago. What I'm saying is when he realizes at the beginning of the evidentiary hearing, the testimony in the state court is delayed and we don't know how much was delayed, but it sounds like it was delayed several days. Certainly the particular witness was delayed several days. At that point, he doesn't know he's got a potential problem if that thing is truly forecast for two weeks. He knows he has a real problem. Judge, you know, we really can't tell that it was delayed several days. This 14-day trial was over really just one day late. And then the state judge was dark on Friday and said, come back on Monday and argue. If the state court had had the jury back to argue the case on Friday, the case would have been completed. Why was it dark on Friday? I don't know what the state court's reasons were for the way it handled its calendar. But what I'm saying is... Is it a holiday? No, Your Honor. In fact, on that day, an application was presented for a continuance because at that time, it was clear to the state judge that Mr. Harley had a conflict when he said, you know, we're going to come back on Monday. Mr. Harley said, I'm due in federal court on Monday, Your Honor. And, you know, this case was supposed to be done a couple of days ago. And... Sometimes when I'm running late, I'll park illegally and I'll get a ticket. And it's the price of doing business. Well, Your Honor, getting the... Being held in contempt of state court is a little higher price of doing business. It's particularly when the lawyer didn't set these matters on the same day for two different conf... You know, for a conflicting calendar. The lawyer simply thought it was going to be closed. And I submit that when a lawyer has a busy schedule and when... As soon as he's aware of the actual conflict, he brings it to the attention of both judges. You mean the state court's very rough on this? Are they? Well, Your Honor, in this case, the state court found out that the appearance in federal court was at 9 o'clock and ordered Mr. Harley back an hour earlier, even though he hadn't been going to state court at 8 o'clock in the trial up until then, to make sure that  And I understand the state court's thinking. State court had a trial that was done, ready to argue, and he's got jurors, and he said, look, we have to finish this case. If I lose you to a trial in federal court, I'll never get you back, and this jury will be sort of hanging here. I do think that this became a little bit of an ego contest between the state and federal court, because as soon as Judge Prickett in state court got the call from Judge Stadler, who, by the way, you know, had been both deputy district attorneys in the Orange County DA's office together and had both been on the Orange County Municipal Court bench and now the Consolidated Superior Court bench, which Judge Prickett sits now. As soon as he got the call from the federal judge, he made arrangements necessary to delay everything for a day, let Mr. Harley go to federal court, by now late, 80 minutes late, and Mr. Harley shows up, and Judge Stadler cited him in federal court for being late. Mr. Harley went back the next day, when the federal case was dark anyway, finished his state trial, and then proceeded with the case. In other words, Judge Prickett wasn't getting in, but I think it was because he was viewing his own trial. Judge Stadler, of course, said, you know, I'm not going to continue this case for you, because you're bringing this up to me on the 11th hour, when I've got all these witnesses, and this case has been sent since February. Really, what we briefed here is, does the lawyer's motion to continue in the state court... He came there, how many minutes late? 80 minutes late? Yes, Your Honor. 80 minutes late, and so he took care of his business then. Well, no, he didn't take care of his business. The business was to argue the case to the jury and instruct. What he did was, he implored, he begged... Let's talk about the federal court. I'm sorry. So he went to the federal court, he was 80 minutes late. Yes. Okay, then how did he get back to the state court? The federal court was dark the next day, or two days, within the next two days, and he was able to go back to the state court and finish his business during a scheduled downtime in this case, in the trial. That's the reason, that's the irony. What day did he show up in the federal court? What day? On the day he was scheduled, October 1st. What day of the week? I think it was a Monday, October 1st. It was Tuesday. It was Tuesday. Because they have law in motion on Monday. Okay. Well, you seem to concede that, aside from maybe there was some vanity between the judges, I don't know if that's true or not, but there was some negligence, at least on your part. Is that correct? Your Honor, I don't concede that the lawyer was negligent. Or fairly so. Orally here, that it was negligent. I think that, I can think of a way that a lawyer could practice a little better, but I don't think anything... And what do you think would have been more expedient for him to have done it, when he knew he was in this pickle? I believe that if... At the earliest date. In my view, as soon as he was aware that the September 14th trial was set, it would have been prudent to say to Judge Stotler, I know this case has been set for a long time, I'm getting forced to go to trial on the 14th of September, it should be done on the 28th, but I may have a problem if for some reason the case runs over. I think that's what he should have done. If I can finish my answer... Okay, go ahead. I know that's true. But I'm concerned, as the trial in state court unfolds, what he should do to give the federal judge notice that he can't show up. My view is, as soon as he knows that there's going to be a problem, he should alert the federal judge. And in this case, he did. As soon as he knew he was being ordered to appear on Monday, October 1st, by the state judge, he immediately went to the federal judge and told the state judge, I can't do it and I need a continuance of that, and went to the federal judge and said, I've been ordered to appear on Sunday. But didn't he know that a lot earlier? He was under the auspices of the state judge, and he had a conflict between the state and the federal judge. Didn't he have the opportunity at least to call the federal judge's court and say, look, I'm on trial here, it looks like I might not finish or I might be held over? Well, see, this is the way this is very... Your question, Your Honor, is vague enough so that the answer is no, but he never knew he might be held over. If you present to the state court a federal judge or the federal clerk, to the federal district judge's court, the possibility that I will have a conflict in the future if my current trial runs over, what possible remedy would you have? What kind of a ruling can you get? On this record, it's clear this district judge wasn't going to continue this case, Your Honor. She had emphatically denied a motion to continue on the 10th of September, and I've submitted that transcript to you. And Mr. Harley was present. And this judge is a judge that is well known for having a busy schedule. She's also the chairman of the Rules Committee. And, in fact, this judge has been reversed for trying to case piecemeal in the United States versus, hey, I don't have this right here, I really don't think it's an issue here. But the judge was keenly aware of scheduling problems and of having to keep her calendar moving, and she articulated that in the transcript of Mr. McDonald's motion on the Travers continuous motion. You know, for Mr. Harley to go and say, I might have a problem, I can't imagine that anyone could reasonably believe that Judge Steinberg would care. You know the way that they should do these things.  You see, you have a courtroom deputy, knows your calendar, knows the lawyers. And the lawyer would call, Mr. Harley would call Mr. Johnson and say, Dick, I'm over here, you know, I may have a problem, and keep him advised, you see. And then the clerk of my court would then probably talk to the clerk in the Superior Court, tell him what's going on, because one, you know, they don't have any idea of the way we work, and we don't have too much of an idea unless we serve on that court how they work. And so they could have worked it out that way. So, you know, this whole thing, I think this is the first time I've ever heard a case like this. Your Honor, I agree that it could have been worked out informally. Mr. Harley did make a written application to the federal court a few days before he was supposed to appear, when he knew he had a conflict, and he did stay in touch with the clerk. In fact, it was a call to the clerk that ultimately resulted in Judge Stotler calling the federal court. He also called Mr. McDonald and told him the night before, look, Ms. Judge Prickett is not going to let me go. I've been ordered to be there an hour early, an hour before I have to be in federal court, and please inform Judge Stotler that I am there and trying to get Judge Prickett to change his mind, to let me come to federal court. And my only point here on this appeal is this is a criminal appeal, Your Honor, and one of the elements of the crime which must be demonstrated by the record beyond a reasonable doubt is willfulness. And it seems to me that all these cases show that when a lawyer does everything he thinks he needs to do and knows everything he knows how to do to try to appear in federal court on time and in the right place, that that's not a willful contempt, even if Your Honors are all correct, that it would be better practiced, that it could have been worked out informally, or that the lawyer was negligent. And I submit that the criminal conviction should not be a problem. I've used almost all of both parties' times on the appeal, talking about Mr. Harley, and I'll be happy to proceed in any way I can, but I'd like an opportunity to talk a little bit about the criminal appeal. Yeah, now that we've settled or at least argued the $1,600. So there's more money at stake in this. That'll include some imprisonment. Why don't we just hear from the government just on this issue. Okay, we'll hear from the government on this issue. May it please the Court, John Harley on behalf of the United States. And it's okay with the Court, but I'd like to do his name. I'm glad they sent someone down here by the name of Earl. Believe me, with a name like mine, if I was ever late, there would be, ever since second grade, I've had problems. Is that right? What I'd like to do is start with a couple of questions the Court asked. First of all, regarding how long the evidentiary portion of Mr. Harley's state court case was delayed. And this is according to Mr. Harley's declaration. That case was supposed to start on September 16th. After they swore in the jury, he said there became a witness problem, which meant that the testimony wouldn't start until September 23rd, the following Monday. So clearly, fairly soon after the start of that trial on September 16th, with its two-week time estimate, he knew he wasn't going to be taking testimony until September 23rd. But that entire week from September 16th on, there was no contact made to the federal court. It's unclear what, if any, contact was made to alert the state court to the fact that the federal trial was now seriously in jeopardy. The evidentiary portion starts on September 23rd. You know, a lot of times in the state court, you know, they come in and plead. So, you know, they're not as harsh as we are. Well, that's true, but they had selected a jury on September 16th, which made it less likely, substantially, that the guys over the following week are going to suddenly plead. He's seen the jury panel. He sees who he's looking at, and more and more time goes on, and he's proceeding on the trial. Well, you don't know. Well, you don't know, but one of the key points in getting to the issue of willfulness is, what really was taken away from both the federal and the state judges, the information for them to make whatever informed decisions they wanted to make. Maybe the guy would plead, maybe not. But I think both judges would have liked to have known that this issue was out there. And the fact that there was a continuance motion on September 10th, I think, demonstrates how important this trial date was to the district court. But bear in mind, that continuance motion was to continue the trial by four months, as opposed to a week or a day, or at a minimum, allow the state and federal judge to monitor the situation and keep in mind, some courts are dark on some days, some courts are dark on other days, and that's ultimately how the issue got resolved when, for the first time, the federal judge on the morning of trial. Why was that state court dark on Friday? It was dark on the previous Friday, the 27th of September. Now, we don't know why, but in his declaration, Mr. Harley wrote, and I looked it up and wrote it down, this is at page 13 of the record, as previously scheduled, the superior court was dark on Friday, September 27th, and Monday afternoon on September 30th. So this was not a finish up on Thursday, hey guys, we're going to be dark Friday and Monday. He'd known about that in advance. So what he knew... They're not in a hurry over there. They're not in a hurry. No. More relaxed. That's probably true. But if the state court judge had known about this impending conflict earlier, perhaps he could have had testimony go forward on Friday or done some of the ministerial things like working through jury instructions, making sure they were ready to finish up Monday morning where they weren't dark. But instead, the whole thing was put over until Tuesday, and that's the point where it's contended that Mr. Harley realized that the potential conflict became an actual conflict. But the point is, on the one side, it's not willful contempt to just not show up. That's not willfulness. You have to see why. But the flip side of it is it's not not willful to come in and say, hey, I've got two competing things going on. I'm supposed to be in two different courts. Therefore, if I don't show up in one, I cannot, as a matter of law, be held to have willfully violated that court order. What you look at is, how did we get in this situation? And that's what the Fifth Circuit case in Ono and the Sixth Circuit case or the Eleventh Circuit in Baldwin talk about. The key is, how did the conflict arise, and how quickly and how diligent were you, the attorney and officer of the court, in trying to resolve the conflict? And the standard is, for officers of the court who are late to hearings, is, were you reckless in the performance of your duties as an officer of the court? Scheduling two trials back-to-back. That's not reckless. You know, we're all busy, and sometimes you've got to do that. But what's reckless is, it goes from September 16th, a two-week trial estimate, to taking testimony on September 23rd, being dark Friday and Monday afternoon. That means he had four and a half days, four and a half court days, to finish this trial that had a two-week trial estimate. And he knew that after the jury was picked on September 16th. And yet, Mr. Harley did nothing that week, did nothing the following week, until the Friday before trial when he filed a written motion with the district court that merely said, I've been ordered to appear in state court on October 1st, didn't say which department, didn't say, well, I should take that back, didn't say which judge, I don't recall if he said which department, but didn't give the district court any information to try and work, resolve the doubt, and by the same token, apparently didn't give the state court judge the information that he would want to know to resolve the issue with the federal court, such as the fact that in federal court, unlike state court, they only bring a jury panel in one day a week. So you can't just bump a trial by a day, and have a jury panel that's always there five days a week, ready to jump in. That this was a three-defendant fraud case with a two- to three-week trial estimate, that it had been set back in February, and that the jury panel would be sitting there waiting on Tuesday morning. So these are the things that both judges would have liked to have known, but Mr. Harley, by the way he handled it, prevented them from knowing that until, boom, October 1st, the conflict is dropped on their laps. Procedurally, the court gave him 15 minutes' notice to bring it on for hearing. Not a little fast and furious from your experience? If that's all there was, yes. If that's all there was, yes. But that was a week after she had initially identified for him why she was citing him for the contempt, the grounds for it, gave him three days to file a written response, and advised him that there would be further proceedings on this, and then actually gave him 15 minutes' notice for when the further proceedings were, which was the first opportunity after the underlying criminal case had been submitted to the jury. So I don't think it was any deigning that this was coming once the criminal case was submitted. Well, he knew it was coming, but don't you think he objects to the short notice because he wanted to be better prepared and to set forth what his position was with some specificity. And it just seemed to me, you know, I've been in these types of things, that attorneys would like to have notice a day certain and prepare for it. And that the 15 minutes, especially when he's on his feet and he's got a jury out, he's got another case and he brings this thing on for 15 minutes, that seems that it speaks sort of that frontier justice almost, that we're waiting for bringing the guilty guy and we'll give him a trial. Well, again, there is background. He had been given notice a week earlier. He had filed papers as much as he wanted to file, and then the 15-minute notice in realis, this court said, 10-minute notice of a contempt hearing when the person is an attorney who appeared late, as opposed to a juror or a witness. That's in realis. Realis, right. Yeah, yeah. That, yeah, you know, I read that. That really bothered me. But there's a lot more facts. I know. I know, Alice, and I know the judge, and I know, you know. Yeah, but this one is a lot more factually complex, and there's an attorney showing up late for trial. Right, and that's why the additional week to supplement the record, to submit any sort of paperwork he would want, to add whatever facts he thought were important. But it was in the middle of a trial. You know, middle of a trial. Would you like to do that? No, I wouldn't. Would you like to try a case with a sword of Damocles hanging over your head? You've got to worry about that. You've got to get the papers in. You've got to think about it. No, I wouldn't like that. Then you finish your final argument, and, okay, stand up there, and we're ready to hang you, huh? Well, the answer's not yet. What do we have to say before we drop the cord that opens the trapdoor? I wouldn't like to do that. But that said, this was not all that complicated. It was what had you been doing for the last two weeks, which you could have and did submit a declaration, and the judge gave him an opportunity, if he wanted to, to file additional papers. Do you like what you're doing today? Do I like what I'm doing today? Yes. Do you? Yes. Enjoy it, huh? Yes. Good. I guess if there are no further questions, I'll submit. Okay. Thanks. You want to? On the suitcase. On the what? Have you heard of the Trump on the suitcase conference? Oh, yeah. The only two comments that I wish to make, and that the Court wants to question me further, is I don't know where counsel gets the reckless standard. I don't think that's the law. I think willfulness is willfulness, not recklessness. But if this Court finds that my client, Mr. Harley, was negligent, then I submit that this case would be controlled by Armstrong, which I cite in the brief, which is a Ninth Circuit case from, I think, 86. No, it's got to be such negligence that it's, to speak, reckless, willful. Yes, reckless, willful. Not just recklessness, which I don't know what the Court fears. So reckless has to be speaking. Willful. Yes, I agree. The other thing is, on the Ellis case, Your Honor, that lawyer had been repeatedly held admonished for being tardy to that Court, and he admitted that he had no excuses. Once before, once before. He was a conscientious guy, you know. He was reading something, you know. He got down there, what, 20 minutes late and lost his head, you know. Your Honor, my client got there 80 minutes late and got, not only lost his head, but was required to then report to the State Bar his, the finding of contempt because of the amount of the fine. I quoted on page 20 the opinion in Ellis of my reply brief, and it says, Ellis had been tardy. Had he ever been held in contempt before by any client? Mr. Ellis? No, no, your client. No, Your Honor. Clean. I'm sorry? Clean. Yes, Your Honor. He had a clean record. But I'm just quoting the opinion of the Court. In Ellis it said, Ellis had been tardy on previous occasions and had been strictly admonished, and Ellis agreed to that. So I think the notice issue should be treated differently than a person who has never been late, never been admonished for being late, and never been… Well, Ellis agreed when the judge was questioning him. In the opinion it says that Ellis agreed that he had been… But he agreed when the judge was questioning him. Yes, that he had been admonished on previous occasions for being late. And that distinguishes our case in terms of this alleged similarity of notice. Unless the Court has other questions, I'll submit on Mr. Hartley's case and then proceed however the Court wishes in terms of arguing the criminal matter. Go ahead. All right, thank you. Your Honor, may it please the Court, I represent Mr. Travers, and in Mr. Travers' case we've briefed seven issues. I'm going to try to speak briefly about a couple of them and ask that the Court indulge us in terms of time and let Mr. Hanson speak about some of the others because we've joined in one another's issues. The first one is this question of the continuance. And I know we've talked a lot about continuance already because of Mr. Hartley's appeal, but Mr. McDonald, who was representing Mr. Travers, made a motion to continue the case for several months and cited the fact that he was not prepared to go forward since he had been appointed late compared to the other lawyers in the case. But he was appointed in February, wasn't he? Yes, Your Honor. And he objected to going to trial when? October 1st. October 1st. Yeah. It was a long time. But this record is unique in this regard. Prior to that, the District Court had made findings at the urgings of the government as well as the defense lawyers before Mr. McDonald was in the case that it was necessary, that the time was excludable, and it was necessary for the preparation of this complex case for two years of continuances for the other lawyers. And Mr. McDonald was appointed when he, a lawyer who just does court-appointed work, had other federal trials already set before the time that he took this case and said, yeah, it looks to me like I could be ready in October. Of course, what knowledge he had of the case was only what a cursory summary of the case was at the time he was appointed. Yeah, that's a lot of time. It is a lot of time. And when you've got a lot of time, you wait until the end. Well, Your Honor, he said he was doing other trials. The trial judge basically said, you know, this is my oldest case, and you're just going to have to get ready. Even though his declaration said he had 146 computer disks, two floppy disks, and 30 computer diskettes, and I'm looking here now for the number of boxes, but I think he said a large number of boxes that he hadn't even looked through yet as of the date of this motion to continue. Well, we understand your position on that. All right. Then I'll go on, because I don't want to belabor a point. On the prosecutorial misconduct issue, which is the only one that I wanted to address, Your Honor, I think that this Court is in the identical position as the trial court in terms of whether or not these remarks were disparaging of the lawyer or disparaging of his argument. The trial judge said, since the day I recall what happened, this Court actually can read it. And that's one of the reasons for appellate review on a record is that in the dispassionate time review, you can see whether or not there was an attack on the lawyer. I submit, and I won't belabor it unless you have questions, I submit that this was an attack on the lawyer. And the repeated use of words like showman and magician and sideshow and talking about what sorts of people do that. Well, we hear that all the time. Your Honor, it doesn't make it right. This was objected to misconduct. Usually what happens, we hear it all the time, I do a lot of appeals, and most of the time defense lawyers don't have the temerity to object when they're being disparaged. But this is a case where, on an objection, if this is misconduct, we have a very high Chapman standard to apply. And the question then is, can you say that this would be harmless beyond a reasonable doubt in the context of a case where we have a lawyer who said he wasn't really ready. We have the prosecution introducing 10 witnesses by letter to corroborate their live victims that come in to thus contradict and impeach the testimony of the defendants. And then to tell the jury, gee, the facts are hard to dispute. All they have is these sideshows and smoke screens that this lawyer is doing. And I submit that you can't say that this is harmless beyond a reasonable doubt on this record. Well, why is that disparaging of the lawyer, not of the testimony that's being presented by the lawyer? I mean, I don't see that. I hear a lot of these claims of denigrating the counsel. But if I was sitting in the jury box, I would say, well, we're talking about the evidence that this guy is trying to put here. And I don't believe the evidence. Your Honor, in the Bruno versus Rushing case, which I cited, this court said that it's misconduct to say something that impugns the lawyer's integrity, even if it is only intended to impute guilt to the accused. In other words, in this case, Your Honor, I understand that a jury may have said, well, I guess this just means the prosecutor thinks they're guilty. But the way the prosecutor was making the argument, he said, you know, this is a sideshow and a smoke screen. And here's the type of person that does that. And he described magicians and snake oil salesmen or whatever people he referred to as people who are dishonest, who are trying to lie to you. And that's discouraging of the lawyer, not just saying these arguments are wrong and they're not supported by the record. He's saying the type of person that uses sideshows and smoke screens are people that are trying to deceive you and mislead you. And by anthropomorphizing, if that's the right word,  instead of what was being done, it was discouraging of the lawyer. And I submit that, of course, the purpose was to convince him. Then he'd come back and say, well, is that the best argument he has about smoke and about snake oil? If his response had won, he wouldn't be here. Then he'd get the burden of proof beyond a reasonable doubt. Sure. He might have had an answer to what I submit as prosecutorial misconduct. But it doesn't mean it's not misconduct or that the record shows beyond a reasonable doubt that it didn't affect the verdict since it was designed to persuade the jury that the defense case was full of lies and the prosecution case was true. And the reason was because the type of person that makes this argument is trying to lie to you, is trying to deceive you. The only other issue that I'd like to address, if the court has questions of me, and Mr. Hanson is going to argue it, is this question of the letters. Because the government has essentially said, well, gee, there's technically no violation of the hearsay rule here. And their argument seems to me to be two-sided. It says there's no violation of the hearsay rule because these letters weren't offered for the truth of the matter. And then says, well, the reason these things are reliable is because they fit within an exception, so there's no requirement for reliability versus Lilly versus Virginia. But it seems to me that if you look at this record and if you really read this transcript, the letters were letters of people just like the victims who came into court complaining of the exact same lies and telling the employers of the defendants that they'd been lied to and they'd been defrauded. And this is really unvarnished hearsay that was not subject to cross-examination from out-of-state witnesses whose testimony went in by letter. And if the defense lawyer that I... Well, where'd they get these letters? They were letters that were seized in a search warrant, I believe, from the enforcement when they busted the telemarketing company. They were letters of complaint. Oh, I see. So your clients kept those. Well, my clients didn't, but their employers did. The telemarketing company did. Yeah. And these letters, then, were... It wasn't just... I mean, it isn't just there were complaints. It was the contents of the letters that was received. And this was just corroborated. This was ten people who didn't come to court whose stories about how they were cheated were corroborative of the few people that did come to court before, I think, that did come to court and testify. And, you know, this case turned on credibility. The defendants said, we didn't think we were doing anything wrong. Our lawyers... We were told that the lawyers passed and everything. We stuck to the script and we didn't lie. Was there also testimony that letters like these letters were passed around among the telephone salespeople? Your Honor, I think that the government did field a... I'm not sure if it was a former defendant or if it was just an employee who said that these letters were made known to employees or that letters like these were made known. And the employees laughed about it. Yes. They joked about it. Yes. I can't think of anything more prejudicial, but I can tell you that that's in addition to the lack of an ability to cross-examine the writers of the letters. In other words, these people that wrote the letters were not present in the trial. And that's what I think is significant about this, notwithstanding the technical arguments that the government has made for why it would be fine to do this. I mean, these weren't even offered as other acts. They weren't offered as inextricably intertwined. They were offered to establish the fact that complaints were made. But then they were really used to show that the defendants were lying when they said they didn't lie to anybody and that the people who came into court and said they did were wrong. And it's so corroborative of the lie victim's testimony that it's difficult for me to see how the defendant could get a fair trial in terms of testimony that's not subject to cross-examination. Let me ask you a question, unless Mr. Hanson wants to address it, and that is with respect to the sentence. Oh, yes. That is, the amount attributed to both of these defendants is in each case slightly over a million dollars. Both in terms of setting the level and therefore the period of incarceration and also in terms of setting the amount of restitution. Yet, the amount that they are actually personally responsible in terms of sales is substantially less than that. Yes, that's correct. How am I supposed to deal with that? And particularly, how am I supposed to deal with that given that it appears that there was no objection made at trial? Your Honor, I don't think the objection would be made at trial, but at sentencing... At sentencing, I'm sorry. I will look while Mr. Hanson is talking if I have the excerpt from the record here, but I believe that Mr. Travers' counsel did object to the amount in his sentencing papers and said he should only be responsible for the amount that he was personally connected to. But we've raised the issue of whether the court applied the clear and convincing evidence standard to this because the loss element was the significant element of the sentence and it fit into the tail wag the dog issue that this court reversed the sentence in the Munoz case. The thing about the Munoz case, and I cited it a couple places, because it was the same trial judge. This trial judge was reversed in the Munoz case for not articulating that she was finding the loss by clear and convincing evidence even though it was by far the overwhelming factor and it was reversed for Mannon and then there was a further sentencing hearing. But there was objection on direct appeal in that case. Objection in the trial court. There was an objection to the amount of loss by Mr. Travers. I don't know. I didn't see it here. Well, I'll speak for myself. I'm remembering. I'm speaking from memory, but I think his sentencing papers, I believe, were reported. We'll hear from him. Even in the absence of objection, I submit that the trial court is required to make sentencing findings by the appropriate standards. Now, you might find it harmless if there's no objection or people stipulate that a fact is true. I can understand why the standard becomes less significant, but I still think that the law of the circuit is that a trial judge must articulate that they found by clear and convincing evidence loss which is the significant element in the sentence. Well, there's no objection to the loss to the sentence. The PSI had all this in it and so forth. Right, right. And the testimony here was very much in dispute. I mean, these guys say  and the factual dispute as to the amount of loss was very, very much in dispute and who was coming and when they left the conspiracy and so forth was a hot issue. The facts were in dispute. Why isn't this a 2255, the issue, if it's an issue at all? You mean for ineffective assistance of counsel for having no objection? Yeah, yeah. I submit that the fact that the amount of loss was in such hot dispute put the trial judge on notice that it was necessary to make a finding by the appropriate legal standard. If it was objected to. If there was no objection. And I'm sorry, but I can't... Well, you may be able to put your hand on it right now. Oh, okay. Thank you very much. We need to hear from Hanson. Well, glad to see you're still alive and kicking. Glad to see you, Your Honor. It's been a long time. Yeah. I'm not sure that I can add a great deal to the arguments of Mr. Kopeny on I think it was trial exhibit 75 through 80 for his client and 81 through 85 for my client. But I think it's quite clear that this was a denial of confrontation. Clearly a denial of confrontation and I believe it would have to be evaluated by the Chapman versus California standard. I think there's no question, there's no limiting statement for the judge as to what you could consider it for. It essentially went in to supplant the guilt of these people and I think that it's impossible to say that it does not violate the Chapman rule. Well, it was offered by the prosecution. These guys said that they were not aware of any wrongdoing. They were sure as a driven stone and this was offered to show that they knew that there were complaints out there and to show that they were aware that they were engaged in intentional wrongdoing and in fact, they had a big laugh when they read these letters. That's the prosecution's position as to why they were altered. So what's wrong with that? Well, I'm not sure who was doing the laughing. That's number one, Your Honor. No, your client was doing the laughing at the letters. That's the evidence that was, as I read the briefs, that's what the government's position is. Well, I don't know. Of course, I wasn't there in these rooms. You know, somebody laughs, somebody says something. I think that's probably quite peripheral at this time. I can't put my hand on that particular thing. But I think it's quite clear that if I can move to one other point here, that there was a huge number of witnesses, both called by the government and called by the defense, that indicated that the proprietors of this group had told them that a lawyer had examined this text and the lawyer had approved this thing as not being any violation and so they went ahead and used the text. Now, admittedly, and I believe in intellectual honesty before the court admittedly, I was troubled with the fact that, say, somebody called from the state of Kentucky and they said, I would like to buy this program. Then, apparently, they were putting on hold, so to speak, let me check and see if there's available space in Kentucky for you. Of course, that was not a concern of the company. They were taking on all comers. So I admit that that was a, perhaps, potential falsehood, although it could be something, you know, act now because this is a program you ought to get into, and so forth. In the defense of advice of counsel, I'm doing this under counsel's advising, I'm doing this proper. They never, your client never consulted an attorney and got that advice. Well, no, he didn't, but he, after a couple months, my client was only there for three and a half months, your honor, and about the third month, he kind of thought there was something going on here, and so he did consult a lawyer, and the lawyer says, you know, this looks a little bad to me, he said, you better quit. And so he resigned. And so I think that gets to the issue of this huge amount of money that was assessed against him, as well, which I'll get to in a little bit. But I will say to the court that these people are lay people. You know, my client, I think he has, at most, a high school education. They don't have the ability to ascertain things like a lawyer might be. And so when he is told that a lawyer, a trained lawyer, has evaluated the script and has approved it as being nothing in violation, well, they go ahead and do it. And two witnesses from the government supplanted that. I think it was Jason Wilkie and Deborah Light, Light, if I pronounce it right, verified that as government witnesses, which gets to my point where the judge says, as to their testimony, you should view it with caution. Well, possibly, some of it ought to be viewed with caution, but not that, because that removed from the defense a defense that would indicate that these people did not believe anything was going on wrong. And I think it gets within the meaning of Kuhl versus United States, which I relied on, where there the U.S. Supreme Court said if a defense witness testifies favorably for the defendant on trial, it's error for the court to say you can't use it unless you believe it beyond a reasonable doubt. And the U.S. Supreme Court in Kuhl versus United States reversed that, and I'm attempting to analogize the Kuhl case to this particular thing because the instruction given on these two witnesses called by the government was that you cannot, you have to view their testimony with caution. You'll acknowledge, though, your client, before he removed himself from the conspiracy, whatever date that be, it's sort of up in the air for me, did not consult an attorney and was not engaging in this conduct under the advice of counsel that he consulted. I think that's clear. He did not go out and say, take a look at this script and tell me if you think it's valid or not. But he was represented so by several other people in the group, including the proprietors of it. But your client, while there, was privy to the letters that were sent in of complaint. They were read, and I believe he was one of the ones that laughed at them. Well, I'm not sure about that. I have a lot of cases, and I frankly did not look at that particular aspect of it before I came in to talk to the court this morning. But if the court has a vivid memory of that, why so be it. But there's other problems with this thing, I think, and that is basically all the things that were used by the government here was quite harmful, I think, within the meaning of Chapman v. California. And that last one, I think, is a good example of it, that the instructions were against them, and the introduction of the letters without any chance to confront them were against them. I think those are all Sixth Amendment violations. And then getting down to the issue of the money, as the court has observed here, the amount of money that was attributed to either one of these defendants was rather minuscule compared to, I think, $1,700,000, which elevated it over the $1.5 million and a plus 12 augmentation of the U.S. Sentencing Guidelines. Had that not been augmented, they would have been down where they could have been in the zero to six months range and could have gotten probation ostensibly from the judge. Did your client object to the figure in the PSI, the dollar figure? I think not, Your Honor. I know not. So, if that's an issue, how is that an issue on direct appeal? Well, nonetheless, I think the court should articulate, according to Munoz, that the court finds this true by clear and convincing evidence, and the court did not do that. Well, don't you have an obligation representing someone at sentencing? You've got the PSI. You have to have it, as a matter of fact, by court rule. Prior to sentencing, go over it with your client. You see you're being enhanced because of such and such amount of money, and you don't object to it? Well... And you then appeal that failure to object to the court of appeals? I think the concept, at least I suppose, if I would put myself in the same position, I'd say, well, they're alleging an overall conspiracy, and the theory is... Everyone's liable for everything. Yeah, you're liable for everything. Right. And the government did, in fact, I guess, introduce evidence so it was without an effort to offset some of the money that was returned because some of these people that complained did, in fact, get their money back. I don't know what effort was made to really offset that, but it just came in in that particular aspect of it. And I think that's very unfair to these defendants that that amount of money, which is huge, is really the tails wagging the dog in this particular case. No question about it. Elevated this plus 12 in the U.S. Sentencing Guidelines. Well, why couldn't that be cured properly on a 2255 then? That's, you know, not only that, we don't have, if this were to be adjudicated by us, we don't have the defense attorney's testimony as to why he did not object. We don't have the prosecutor's testimony or briefing as to why he thinks the figure was correct. In other words, we're shooting in the dark if we say that the trial judge made a mistake on the amount of loss. Well, I'm sympathetic to that because I'm kind of in the same way. I got this appellate record as routine to do the appeal. Of course, it's kind of like somebody writes a script and gives it to some actors to act out what was done. So, I'm cognizant of that, and it may be a 2255, but it is obviously an issue because it elevated the sentencing huge. It's an issue, there's no question about it. Let me just move on to one other thing that I wanted to mention. I think the court erred in not attempting to have the jury specifically find what act, if any, of falseness occurred here because there was no evidence of that. So, the issue that I talked to you about where they were put on hold, so to speak, to check and see if there was available spots in the state of Kentucky, for example. Didn't the instructions tell the jurors that they had to agree at least unanimously on one? Yes, it did, yes. But I think that this record, we cannot tell now whether that in fact happened. And I think that has to be the answer. Well, we have to assume that the jury followed the court's instructions. Well, I know that's what I've been told other than that. I think finally that all of these accumulate to Chapman error, Sixth Amendment deprivations of effective assistance of counsel and so forth, and have to be measured by the Chapman versus California test, 386 U.S. 18 and 24, 1967. If the court has any more questions, I would attempt to answer, but I'm sure we probably exhausted time here. Take care of yourself. In answer to, I think both, I think I was asked by Judge Fletcher, but my client's trial lawyer did not object to the amount of loss, but he did object to the amount of restitution. It's inexplicable to me why he wouldn't have lodged a similar objection to the loss, but I stand corrected. I apologize. I wasn't to the loss. I apologize. That's right. Thank you. Good morning again. I think I'd like to begin just    I don't want to go into great detail, but I do want to point out that there had been two years of continuances leading up to this last continuance. I     into too much detail here, but there were clients firing lawyers close to trial. We unfortunately had one attorney pass away about a week before trial. Another attorney had open heart surgery. Another attorney had Achilles surgery. All leading up to trial. In fact, the day of trial, the third co-defendant didn't show up because he was in the hospital with chest pains and wound up being severed out. But the point being, these were seriatim continuances to address specific concerns and specific lawyers who come into the case with sometimes as weak conduct in those situations. Death allows a continuance and maybe open heart surgery but the fact that I'm not quite prepared is not enough. Considering all the other things going on, yes. I just want to point out one other point. Of the four defendants who were still in the case at the time, the final trial continuance, three of them had been appointed in that very year. Two of the other defense attorneys had been appointed less than a month before Mr. Travers lawyer, the one who said he needed the benefit of all the other time the other attorneys had. In fact, two other attorneys had been appointed just the previous month which was a trial date that had been set as January 8, 2002 and that's the one where one of the attorneys passed away just after Christmas and the other attorney had open heart surgery. So we're not dealing with vast differences in time for the    don't think we're dealing with nearly twice as many. I'll move on to the misconduct claim against the government. The government argument was not intended and was not denigration of counsel. The government would not make an argument that was denigration of counseling. Mr. Copenny, I'm sure accidentally used the phrase, I suggested that there was an argument that defense lawyers were snake oil salesmen. That phrase was not used, was not made. What was said was commonly used terms, smoke screens, side shows, and what I sometimes want to do is explain the derivation of terms. And what I did was explain what a smoke screen is and what a side show is. I didn't detail these things. But it came on the heels of me, the first thing out of my mouth in the rebuttal argument was to remind the defense  that I was standing on a seal of the United States as I was talking. When you say something like that, you're not attacking the evidence that is put in. You're giving a generic expression that what you just heard, the show that the defense attorney just put on is a big   talking about a smoke screen, a side show, smoke and mirrors. It's subtle, but it's obvious that you're talking about the attorney who is driving this and presenting the evidence is putting on a side show. He's like a magician or whatever. You don't take that as being what a jury would see that as. It wasn't my intent. It's not the necessary implication. I don't think so. I think it's to put categories. For instance, one of the arguments I characterized as a smoke screen was an argument made by the defense, where are all the other telemarketers? That's not anything in the record. There's no evidence of that. How do you respond to an argument outside the record except to make sure the jury sees that's not working? You didn't say witness Jones or Ms. Smith just gave you this evidence which is a smoke screen. You didn't say that. You said you see you generically. In some instances I did. I don't know if I specified the witness. But one of them was there was an argument that these defendants had a script and the script was filled with lies. But they just read the script. They did what they were told to do. Therefore, they can't have a fraudulent intent. That was the testimony. My argument was that's a smoke screen. You can read a smoke screen. I'm not sure I would know what that means. We have a library over here. I'm not too bright. I use terms that I understand. But I do like to explain them. All I was doing was explaining the derivation of these terms. The argument is the district court and this court can look at the same case.  look at the tone and the manner in which it was said. And she made a specific finding that it was not denigration of counsel and that she took such an objection and a claim seriously. If she had heard it that way, she would have dealt with it differently. But she did not hear it that way. How about these letters that are sent in and you're offering them to show that they know that they're involved in illegal conduct. I'm offering them for two reasons. I didn't argue these letters in argument. We always expect you to be honest with us. That's a good point. Here's how they came in. The defense called a witness who was a records custodian. She testified to various things and essentially painted this as business people selling out a product. I laid the foundation that these letters were maintained in the ordinary course of this business, relied upon by this business for determination of whether a customer should get a refund and whether they should charge the person who sold this and lied about it, they should return their commission. They're relied upon and maintained and what the evidence showed was that these complaint letters would be included with the customer's file who should get a refund. That is the classic definition of a business record. The business record does not have to be prepared by the business itself as long as it is received and maintained and most importantly relied upon by the business in the ordinary course of its business. That's what this business did and that's what this records custodian authenticated that these letters were included in files and that they were stored and so that's one use of these, one purpose of the evidence. Did the defendants have copies of these letters? There's no evidence that the defendants saw these particular letters. Well, they should have had them shouldn't they? No, the evidence was they would not necessarily routinely be providing the front office wouldn't show the letter to the defendant and ask them whether or not it was true. Well, there was evidence that they knew of the letters and laughed at theology. There was evidence that they received roughly 100 or so letters and that was from the records custodian. This was a defense witness who was describing herself as a records custodian who maintained records such as these and then attempted to paint this as a legitimate business that was just in the business of selling software and these were offered to show her regular business records. The government offered them on cross-examination of a defense witness but it was the defendant who called this witness who happened to be the records custodian for the business. But you developed this proof on cross-examination and that they were aware of these letters. There was no direct evidence that would say that the defendant was actually a record custodian. The government offered this to the defense witness who was a record custodian for the business of selling software and these were the records that were recorded by the government. Lots of times people would call and talk to three or four different telemarketers at various points in time and the letters would reflect on this day I spoke to this person and on that day I spoke to this person. So there were some people other than the defendants referenced in the letters. But the defendants were the sales. These letters were credited to sales credited to the defendants. So to the extent any letters did go to the telemarketers to ask them specifically about them, these letters related to these defendants. We're a little concerned about the amount of money that  on these letters. The objection was whether the court used the words clear and convincing evidence and finding the loss after each defendant separately either stipulated or expressly agreed in their position paper that the loss that the court used was the actual loss. With respect to Mr. Travers, he asked for a correction and the court used his lower restitution amount. That same number drove the loss amount. It just had no impact. It had no impact on the guidelines. He was still in the same range. And defendant Ramirez expressly stipulated that this is the loss amount. As an aside, the way the loss was calculated as it was, the probation concluded and the court adopted it and each defendant accepted that this was a jointly undertaken criminal operation. Therefore, each defendant is jointly responsible for all the sales that were made going on while they were there. If they were there for 10 months, they would be responsible for the sales that took place in those 10 months. You are not responsible if you withdraw from the conspiracy. I guess the evidence is that there is no evidence that defendant Travers ever did anything other than quit. With respect to defendant Ramirez, he argued that he consulted an attorney who told him there are some problems and he stayed around for a few more weeks and then quit. I don't see how the time period would be credited against him. In fact, at this point, he's even more sure that this is a fraud. A lawyer just told him, this looks bad, you better get out of there. If you credit his testimony, that just bolsters that he continued to stay for those two weeks and now independent lawyers told him, boy, there are some problems here. The evidence was replete with the fact that no one who worked there for more than a few hours    was there. The explanation of it is, with respect to Mr. Travers, the evidence was Mr. Travers was the one who brought this idea to the owner. Mr. Travers, for bringing the idea to the owner and writing the script, got a $5 overage on every sale that he was able to do. He was in the very beginning and ultimately left to go to work at a similar business. Mr. Ramirez came in later, he was there for a short period of time, but he had fewer sales than did Travers. He was there for a short  time, but while he was there and he listened to the victims and the types of representations he made, they were as egregious as anyone else. Whether he was there for a short time or a long time, his conduct justified being charged. Thank you. All right. We'll give you about a minute for a bottle because we've gone way over time. Thank you very much for the indulgence you've afforded us. I just want to clarify these letters. The actual letters that were introduced, there was no testimony that those letters were either circulated or that the defendants laughed at them. The testimony was that letters of complaints, hundreds of them, at least a hundred, came in and that such letters were frequently circulated and that the telemarketers were laughing at the letters of complaints. There was no direct testimony that that was true of the letters that we're talking about in this appeal, though, which is the five letters or four letters which relate directly to each of these two defendants. On cross-examination of this custodian, the government found letters of complaint which directly related to the defendants who were on trial, these two, and which were very much like the stories of the witnesses that they called, the live witnesses they called, and those were the letters that came in, not just some letters of complaint which were similar to those that were passed around. It was these particular letters that have the feature of being corroborative of the government's case, not just some letters of complaint   corroborative of the case. I'm not sure that my client has seen these letters. These letters are sprung after trial with charges. They're not offered. All right. Thank you very much. All right. We'll recess until 9 o'clock. Is she still here? Okay. It's all right. Get out while you can. Oh. You're still here, huh? Yeah. Where is she? There she is. Well. Would you like to hear from me, Your Honor? Well, how did you come all the way from Washington? I have. I'm from Harvard. Well, I'll be with you tomorrow as well. Which letter is this? This is the first one. Yeah. We put it     wanted Missoulian to, who was late to come to the hearing. I don't know who it was. It was Missoulian to listen to the argument about what happens when you're late. But he apparently wasn't  learning about that. So he did send us a note. Did you see this? No, Your Honor. Oh, okay. Sorry. It says, uh, is there a motion to decide the matter for decision based on the brief? Since the matter is set for hearing today, I request you inform the court I will not be able to appear due to a conflict and wish the court to decide the matter based on the    receive such a motion? We denied it, didn't we? I'm not sure I saw that motion. We denied the motion for the other lawyer who already appeared in the earlier case. Oh, we didn't hear it. Did you receive such a motion? I just didn't hear it. I'll keep my remarks brief. My name is Julia, I'm appearing on behalf of the respondent. We're going to have the pleasure of hearing from you tomorrow as well. To succeed on his due process claim of incompetent translation, the judge has to show error and that he was prejudiced as a result of that translation. It's interesting to note that the translation issue was never raised before the immigration court and was not raised in the notice of appeal. It appeared for the first time in the appellate brief filed by petitioner's counsel to the board. In fact, in front of the immigration court, because there was no contemporaneous objection to any form of improper translation, you'll see clearly in the record that the immigration judge took explicit pains to make sure that the translation and that the translator provided was a competent translator and who was interpreting in a language that the alien could understand. There seemed to be some tension there in the transcript as opposed to the actual translation. Well, not to the extent that the petitioner argues in this brief, Your Honor. There were three substantive hearings in the case. There were several other continuances for illness of the alien. But on all three occasions of the substantive hearings, the immigration judge inquired of the alien himself what was his best language and whether he understood and could communicate with the interpreter. And on all three occasions he said that, yes, he did speak Armenian the best. Now, this is a multilingual petitioner. He speaks apparently Russian, Armenian, some Georgian and perhaps a little bit of English. But it's important for the judge to make sure, and he did so in this case, that the interpreter provided is in the language that the alien understands best and can best communicate in. There were two occasions where there was a question raised regarding an interpretation issue. In the first occasion in the second merit hearing, which was the cross examination and redirect of the alien, the interpretation of the word hooligan, which is perhaps not most commonly used in  submission. Probably some English-speaking people would not understand what is meant by hooligan. That was clarified on the record. No objections were made, and the case proceeded. The second time an issue came up was later in the same hearing, where the alien apparently used a Russian term in his explanation. The interpreter noted that he used a Russian term, and then the judge again repeated his questioning. How many languages do you speak? The alien responded, and then the judge reminded him that the Armenian interpreter was Armenian, and reminded him to speak in Armenian. It is not uncommon for multilingual people to go back and forth, so I don't think there was any problem there. The petitioner's counsel raised no objection to the quality of the interpretation or to the fact that this Armenian interpreter was ever used. I recollect that we very widely separated the direct and the cross. In the second time around, I think I recollect in the transcript there was some notation toward the end that the attorney spoke Armenian. In fact, the attorney was asking questions prior to the hearing. That's correct. There were no objections at all made to the quality of the interpretation. The objections in the brief to the board and continuing to this court are that the I have a different question here. This gentleman is now either 83 or 84 years old. Why are we doing this? Well, the law requires that he approve a valid asylum claim under the standards provided in order to succeed and be permitted to remain in the United States. Whether the Department of Homeland Security would decide as a matter of its inherent discretion not to remove this particular alien is a matter of discretion.  I don't know. But, why was there, wasn't there, what was the period, there was a 20 months after his direct that the cross-examination took place. Why did that happen? It's not explained in the record, your Honor. Probably attributable to the caseload of that court here in Los Angeles, but not explained in the record. It does seem like a long time. Again, no contemporary objections ever to that length of time, or even on appeal there was no objection to the length of time. It really only enters into the benefit of the alien who is allowed to remain in the state. I guess he has a citizen daughter who lives here in Glendale, and the record is clear that she has not petitioned for him to stay, at least as of the time of the transcript. Does that remain true? I'm not aware of any petition filed by the daughter to the state. In that second time around, there's a little confusion. It says, Sir, before coming to the United States, did you always live in Georgia? Yes. It would happen that I would go elsewhere for a month or two. Okay. I have lived in Stalingrad. When did you live there? Stalingrad, I lived from 1962 until 1970. I was invited to and worked there. Sir, didn't you live in Stalingrad between 82 and 92? No, I didn't live there. Are you certain? I didn't live in Leningrad, but Stalingrad and Stalingrad from 60 to 70. And then he was asked this question, this is all on cross examination. Did they charge you with a crime? Yes, of course, what crime? When I told him the story, I said something about the story about the dog thing, and I said, why didn't you bring the other people involved? They said, this is none of your business, you just speak for yourself. Sir, my question is, what crime are you charged with? Answer, they wouldn't say to me exactly why, they would say to me, you are an Armenian. We speak to you in Armenian, so that something like this doesn't happen to you. You see that the people don't like you, and that's it. You get a lot of unresponsive answers here. But there's no direct tie between the unresponsiveness  alien witness and the incompetent translation, which is the point that he's the only issue that he's raising before the court. Interestingly, he seems to have waived the merits of the asylum claim and raises only the due process claim, but there's no tie between his unresponsiveness to those questions. And again, his Armenian speech. Maybe the translation was at fault. I believe that is Armenian. You said you used what? He has an Armenian speaking attorney. It depends on where they get this Armenian. They speak different dialects and different ways of speaking in Armenian. It depends on where they come from. But the attorney seems to have understood enough to be able to ask a question prior to the full interpretation into English at some point. Certainly, an Armenian speaking attorney would have objected. That doesn't mean he's such a great lawyer. He doesn't even show up in court. I believe that was a different attorney. Anyway, we don't know how competent the Armenian speaking attorney was. There's no claim of incompetent attorney. It appears to me, given my experience with immigration law, that this alien received very good representation. He received very good interpretation at his hearing. His problem is that his asylum claims based on conditions of general civil strife and not issues related to a cognizable ground for asylum under United States immigration law. Didn't they say he was beaten up? Went to jail? Briefly. How long was he there? I believe it was a matter of a couple of days. That's a long time. It could be, but again, I believe that I don't see an asylum claim here. I don't see an incompetent translation claim. I've seen thousands of cases. If I in any way believe that there was a problem with due process here, it would be my duty to send this case back and ask this court to do that. I frankly don't see the point in this case. The alien is elderly. His entire family is in the United States. He clearly wants to get out of  States. What can I say? I would not go out to the city a lot. I wasn't working. If I am amongst them all the time, my friends, the Georgian people, they weren't talking to me. No one was speaking to me. There's just a lot of confusion when you read this. I agree. I agree that there's some confusion, but I don't believe that it was related to incompetent translation. I don't think the record shows that it was in any way related to incompetent translation. It may have been related to confusion on the alien's part, the desire of the alien to say the things and answer certain questions that weren't asked, but I don't think that there's any tie to incompetent translation here. And as such, he can't make out a due process claim. He can't succeed in this lawsuit. But you don't think there were any communication problems between the interpreter and the defendant? I don't believe so. There are only those two issues that I can think of. The first issue with the hooliganism and the second issue with the use of a Russian word the alien returned to using Armenian language and the hearing continued from there. But I don't think in any way that his nonresponsiveness can be attributed to incompetent translation. Well, wasn't he able to make his argument only to the translation and the due process issue and not to the merits of the asylum claim? Well, you're right about that. Okay. Anything else? No. Thank you, Your Honor. Thank you. Thank you for your patience. We'll recess until 9 a.m. tomorrow morning. All right. Thank you. These are all my law clerks right to the right of you.       law professor, Michael. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.     Thank you. Thank you. Thank you.
judges: Pregerson, Cowen, W. Fletcher